FILED
2016 Oct-27  PM 01:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **BILLY HARTZOG**, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 1:15-CV-726-VEH** |
| | ) |
| **RESOLUTE FP US, INC., d/b/a** | ) |
| **Talladega Chip Resolute.** | ) |
| | ) |
| **Defendant**. | ) |

---

## <u>MEMORANDUM OPINION</u>

This employment discrimination action was filed on April 29, 2015, by the Plaintiff, Billy Hartzog, against his former employer, the Defendant, Resolute FP US, Inc., doing business as Talladega Chip Resolute ("Resolute"). (Doc. 1). The Complaint alleges that the Defendant fired the Plaintiff "in retaliation for Plaintiff engaging in statutorily protected activity when he reported conduct in the workplace that violated the federally protected rights of others." (Doc. 1). The Plaintiff claims that his termination was in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). (Count One).[1]

The case comes before the Court on the Defendant's Motion for Summary

---

[1] The Complaint contains only one count.

Judgment. (Doc. 18). For the reasons stated herein, the motion will be **GRANTED**.

I.      **STANDARD**

        Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

        The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All

2

reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can

satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II.    FACTS

### A.    The Talladega Chip Mill

Resolute is in the forest products industry. It operates pulp, paper, tissue, and wood products facilities in the United States. (Doc. 19-2 at 3). One of those facilities, the Talladega Chip Mill (hereinafter "the mill"), was acquired by Resolute in

September of 2009. (Doc. 19-2 at 3). Upon the acquisition of the mill, Resolute hired

many of the employees who had worked there for its previous owners. (Doc. 19-3 at

3). One of those individuals was the Plaintiff, Billy Hartzog, who is white. Hartzog

was hired by Resolute in October of 2009 to work as a Team Leader. Hartzog had

worked at the mill, for its prior owners, since the 1990s. The only other Team Leader

at the Talladega Chip Mill was Josh Horton, who is also white.[2]

Hartzog and Horton reported directly to David Stewart, the mill

Superintendent. Stewart became the mill Superintendent in April 2010, and was in the

position at the time Hartzog was terminated. (Doc. 19-2 at 3).[3] The Superintendent,

along with the Operations Procurement Manager, both act as Safety Manager at the

---

[2] This fact was proffered by the Defendant.  Instead of disputing this fact, the Plaintiff writes:

> 3.      Objection.  Relevance.  Defendant's averment is not a fact of consequence
> to determine the decisionmaker's state of mind at the time the termination
> was made.  See F.R.E. 401.

(Doc. 20 at 4).  The Plaintiff has made similar objections, based on relevance, to several other facts proffered by the Defendant. (*See*, doc. 20 at 4-8, ¶¶6, 41-44, 82-84, 86, 87-91, 92).  All of these objections are **OVERRULED**.  In cases where the Plaintiff has made such objections, but failed to dispute the Defendant's proffered fact, the Court has considered that fact to be admitted as stated by the Defendant.   It is possible that some facts may be included in the "Facts" section of this opinion that are not material.  However, the Court bases its decision in this case only on material facts.

[3] At the time Hartzog was hired by Resolute, Wayne Nyberg was the mill Superintendent.  (Doc. 19-2 at 3).

5

mill. (Doc. 19-2 at 4).[4] At the time of the events of this lawsuit, Mike Dye was the Operations Procurement Manager at the mill. John Donahue was the Human Resources Manager at the time of the events of this case. (Doc. 19-2 at 4).

### B.   The Safety Audit

At the time that Resolute took over the mill there were only a few written safety related policies in place which, according to Dye, were "loosely applied." (Doc. 19-3 at 4). In an attempt to change the safety culture, Resolute conducted a safety audit. As a result of that audit, multiple safety issues were identified, Resolute's existing safety policies were changed, and more safety policies were implemented. One of the new policies required all employees, including Hartzog, to sign a Safety Policy Statement agreeing to wear the appropriate Personal Protective Equipment ("PPE") at all times. The statement also instructed employees that any employee can notify any other employee of any safety violation.

It is undisputed that it was the responsibility of the person performing each particular job to make sure they were performing the task with the proper PPE. It is also undisputed that the changeover was a learning process. During the first year to year and a half after the new rules were implemented, many people had to be reminded of the rules. In his deposition, Hartzog stated that employees did not always

---

[4] There is not a designated Safety Manager at the mill.  (Doc. 19-2 at 4).

wear the proper PPE at all times and admitted that he did not wear the appropriate

PPE at all times. (Doc. 19-1 at 18(66)).

### C.   <u>Hartzog's Job Responsibilities</u>

As noted previously, Hartzog was a "Team Leader." The record contains the

following job description for "Team Leader":

***Primary Purpose:*** []

Lead the chip mill shift operations team in the management of safety
hazard recognition and mitigation, productivity, quality, cost results,
maintenance activities and compliance with operating policies. The
position is salaried non-exempt.

***Duties and Responsibilities:*** []

1.   Conduct safety inspections and hazard analysis and take
     actions to mitigate safety risks. Drive near miss and hazard
     recognition reporting and corrective actions. Perform
     layered safety audits and track findings. Ensure employee
     participation and engagement in Resolute safety process.

2.   Identify Chip Mill process improvements to lead
     operational and maintenance excellence. Work with
     management and other employees to ensure continuous
     improvement of chip mill results through equipment and
     process improvement.

3.   Lead and supervise operations and maintenance shift
     employees to achieve productivity, quality and cost targets.
     This position is the first line supervisor responsible for a
     shift crew at the chip mill. Responsibilities include
     employee supervision, leadership, coaching, and discipline
     if necessary. Team Leader is to be involved in the annual

and ongoing performance evaluation process, contributing to the evaluation and development of team members.

4.      Ensure that all company policy is enforced and complied with regarding site operational activities including safety, environmental, and other company policies for employees, contractors and visitors.

(Doc. 19-8 at 36 (bold and italics in original); *see also*, doc. 19-2 at 4 (Affidavit of David Stewart) (referring to this job description and summarizing these responsibilities)).

Hartzog understood that he would have people working under him and that he would be responsible to ensure they were following the safety program.[5] Hartzog and Horton ran weekly safety meetings during which they were supposed to train people on the PPE Policy and the "Hot Work" Policy.[6] Hartzog was given written copies of

---

[5]  This fact was Defendant's proffered fact number 2.  The Plaintiff does not dispute this fact.  Instead, he writes:

> 2.      Defendant omits that its handbook contains a section titled "Harassment Prevention Policy and Procedure" which states as "Unacceptable Conduct" that "Verbal abuse and sexual, ethnic, or racial slurs will not be tolerated."  The policy also states that "All members of management have a duty to immediately address any incidents they may witness and to report such incidents to the Human Resources Department at the appropriate location."  And, "There will be no retaliation against any other individual who participates in good faith in the investigation of a complaint."  (Doc. 19-8, p. 16-17).

(Doc. 20 at 3).  This statement has nothing to do with the Defendant's proffered fact.

[6]  The Hot Work Policy appears in the record at document 19-8 at pages 30-35.  The policy applies to "[a]ny work practice capable of providing a source of ignition (for example[] welding, cutting, burning, grinding, and heating)."  (Doc. 19-8 at 30).

the PPE Policy and Hot Work Policy to go over and distribute at the safety meetings. Hartzog admitted he should have known the proper PPE policy.[7] Hartzog does not remember any occasion where he asked someone to put on PPE and they refused to comply.

### D.     The Progressive Discipline Policy

Hartzog received a copy of Resolute's Talladega Chips Employee Handbook. (Doc. 19-8 at 2). The Employee Handbook has a section entitled "Corrective Action Program," which is a discipline procedure consisting of several progressive "steps." (Doc. 19-8 at 21-23). Step 4 of Resolute's Corrective Action program requires that "decision[s] to discharge any employee must be reviewed by the Department Superintendent, Human Resources, and Safety Manager." (Doc. 19-2 at 14; doc. 19-8 at 23).

The manual also provided that for "Serious Misconduct," an employee could be immediately suspended and ultimately discharged without resort to the steps in the

---

[7] Many of the facts in the last few paragraphs were proffered by the Defendant.  (*See*, doc. 18-1 at 4-6, ¶¶12-21).  The Plaintiff provides the following collective response to all of these facts: "12.-21.: Plaintiff refers the Court to Defendant's Statement of Facts ¶7-10."  (Doc. 20 at 4).  This response does not state that it "disputes" anything.  Further, this is not a proper "dispute" as required by Appendix II to this Court's Uniform Initial Order (doc. 4 at 17) ("Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based.").  Finally, nothing about the paragraphs to which the Plaintiff refers the Court disputes, or is even relevant to, the facts at issue.

Corrective Action Program. (Doc. 19-8 at 23). The manual specifically provides that "[v]iolations for which an employee may be suspended or discharged without recourse to any of the 'Steps' include, but are not limited to: . . . deliberately disregarding safety rules, practices[,] and the Lock-Out procedure[.]" (Doc. 19-8 at 23).

### E.    The Broken Loader Incident

In his deposition, Hartzog testified to an incident, in July or August of 2013, where an employee used a loader that had broken brakes and backed the loader over the side of a wall. Hartzog testified that "the key [to the loader had been] put in the drawer of the shop and had a tag on it." (Doc. 19-1 at 74(290-291)). As a result of this incident, Hartzog and Horton were called into Stewart's office and questioned about why the loader was used when the key had been removed and it had been "tagged out" due to its brake issues. Hartzog testified he and Horton "quietened up" on what had happened with the loader because they did not want to lose their jobs or get fired. (Doc. 19-1 at 74(292)-75(293)).

### F.    The Safety Meeting Incident

Jamey Davis, who is Caucasian, and Tyron Machen, who has one Caucasian parent and one African American parent, work under both Hartzog and Horton.[8]

---

[8]  Davis and Machen are close friends who ride to work together.

During a safety meeting, Davis used a variation of the word "nigger" when referring to Machen. In his deposition, Davis stated that he said "nigga." (Doc. 19-6 at 23(86)). Hartzog was in the meeting at the time the word was used. In his deposition Hartzog testified: "I heard what I thought it was. But I wasn't for sure." Doc. 19-1 at 34(130)). Prior to that time, Hartzog had never heard Davis use that word when referring to Machen.

After the meeting, Mark Peters, who is white, told Hartzog that he heard Davis use the word in reference to Machen. In his deposition, Hartzog testified that Peters said that Davis said: "that nigger over there drank my Dr. Pepper."  (Doc. 19-1 at 34(131)). Hartzog also testified that Peters said; "I can't believe he said that in there." (Doc. 19-1 at 34(131)). Hartzog also stated that Harvey Harry, who is also white, also reported to Hartzog that he heard Davis use the word. (Doc. 19-1 at 34(131)). Harry also told Hartzog that he "didn't understand how [Davis] could do that." (Doc. 19-1 at 34(131)).

After Davis left for the day, Hartzog reported to Stewart only that Davis had made a racial comment, not the exact word which was said. Stewart told Hartzog that he "needed to get up there and talk to [Davis] and tell him it will not be tolerated." (Doc. 19-1 at 35(133)).

When Davis came in to work the next day, Hartzog questioned Davis, and

11

Davis admitted he had used the word. Hartzog told him that such language would not be tolerated, and Davis responded that "he understood, and he appreciated [Hartzog] coming to him and discussing it with him." (Doc. 19-1 at 36(137)). Davis also told Hartzog that Horton called Machen a "50/50," apparently in reference to Machen's mixed parentage. Davis insisted that there was no difference in the language Davis had used and Horton's language. (Doc. 19-1 at 35(133)).

Davis's revelation about Horton's comment prompted Hartzog to approach Horton. Hartzog told Horton that Horton "was a representative of Resolute, and he needed to watch what he said." (Doc. 19-1 at 36(137)).

The next day after his conversations with Davis and Horton, Hartzog reported back to Stewart and, for the first time, told Stewart that Horton had called Machen a "50/50." That same day, Stewart called a meeting with Hartzog and Horton to reiterate that such language by co-workers or non-employees[9] would not be tolerated and both of them needed to make sure all of the employees under them were aware of the policy.[10] During that same meeting, Stewart asked Horton to speak with Machen to inquire as to whether Machen wanted to file a complaint. (Doc. 19-2 at 20,

---

[9]  A non-employee truck driver used the "50/50" language over the radio in the guard shack to reference Machen.

[10]  In his affidavit, Stewart states that Horton denied to Stewart that he used the "50/50" language.  (Doc. 19-2 at 20, ¶12).

¶12).[11] Horton reported back to Stewart that he had spoken to Machen and that Machen did not want to make any complaint about the incidents.

Stewart never received any other complaint of inappropriate language. Hartzog never again heard of, and Machen never complained about, the use of the word "nigger" or the term "50/50." Machen told Hartzog that such language had stopped.

### G.    The October 2013 Shutdown

It is undisputed that the mill shut down the entire week of October 6-12, 2013. (*See* Doc. 20 at 8-9, ¶¶1-3 (deemed admitted by Defendant since no denial in doc. 24)).   When a shut down occurs the mill does not run and employees perform maintenance on the mill. (Doc. 19-1 at 37(144)-38(145)).

#### 1.    *The Green Shirt*

Wednesday, October 9, 2013, was one of the days the mill was shut down. On

---

[11]  Most of the facts set out in this section, up to this point, were proffered by the Defendant.  (*See*, doc. 18-1 at 7-8, ¶¶27-40). The Plaintiff has not disputed these facts.  Instead, he writes the following:

> 27.-40.:  Defendant's handbook contains a section titled "Harassment Prevention Policy and Procedure" which states as "Unacceptable Conduct" that "Verbal abuse and sexual, ethnic, or racial slurs will not be tolerated."  The policy also states that "All members of management have a duty to immediately address any incidents they may witness and to report such incidents to the Human Resources Department at the appropriate location."  And, "There will be no retaliation against any other individual who participates in good faith investigation of a complaint."  (Doc. 19-8, p. 16-17).

(Doc. 20 at 4-5).  Not only is not statement not a "dispute," it is only tangentially related to the events discussed above.

that day Justin Morrow, who ranks below Hartzog, was acting as a "safety advocate."

(Doc. 19-1 at 37(144)). Hartzog testified that a safety advocate:

> walks around the mill and looks for -- he's supposed to check -- the best I can remember, he's supposed to take and check the paperwork, make sure everything is done correctly, kind of walk around and look for safety things going on around the mill, make sure everyone is safe and everything is put away properly.

(Doc. 19-1 at 39(149-150)). Morrow pointed out to Hartzog that he was not wearing

a high-visibility shirt, as is required by the PPE Policy. (Doc. 19-1 at 38(146); doc.

19-8 at 27). In Hartzog's deposition the following exchange took place:

> Q.    Okay. What was said about that?
>
> A.    He come down there where I was and told me I had the wrong color green shirt on.
>
> Q.    Okay.
>
> A.    And at that point, he told me that I could wear one of his shirts.
>
> Q.    Okay. Did you refuse?
>
> A.    I can't fit in his shirt.
>
> Q.    Did he offer to get you a vest or another shirt?
>
> A.    I couldn't wear a vest. You can't wear a vest when you're down there grinding or –
>
> Q.    Did he offer to get you a shirt?
>
> A.    He offered me one of his shirts, yes, sir.

14

Q.     And you refused?

A.     I can't fit in his shirt.

\* \* \*

A.     I felt like I was following the policy. I had a green shirt on.

\* \* \*

A.     I should have -- I should have went and put another shirt on. I mean, I -- I listened to him, and I should have went and -- I should have took his shirt and showed him I couldn't fit in it. But as far as putting a vest on, I couldn't wear a vest and do what I was doing down there because they are flammable.

(Doc. 19-1 at 38(146)-39(150)).

### 2.     *The Welding and Grinding Incident*

It is undisputed that some other incident occurred on October 9, 2013.[12] The parties' briefs are not clear on exactly what happened. Investigator's notes taken after Hartzog's termination reflect that Morrow stated:[13]

---

[12]  The Defendant's proffered facts move from the discussion of the green shirt directly into the discussion of this incident without making it clear that it was the same date.  (Doc. 18-1 at 9, ¶ 47).   However, in Hartzog's deposition, immediately after the discussion of the shirt incident, Hartzog is asked about this incident and it is clear that it occurred on the same day. (*See*, doc. 19-1 at 38(147)).  Further, other exhibits in the record make this clear.  (*See*, doc. 19-8 at 48; doc. 19-8 at 50; doc. 19-9 at 22).

[13]  After Hartzog's termination, Lynne Willet, Resolute's "HR Superintendent," interviewed Morrow, and others.  The Court recounts Morrow's apparently unsworn statement, as recorded by Willet.  There has been no objection arguing that Willet's record of Morrow's comments is hearsay.  Even if such an objection had been made, it is likely that the document falls within the business records exception to the hearsay rule.  Fed. R. Evid.  803(6).  Indeed, Hartzog cites to Willet's recounting of the statements of Stewart in order to prove the truth of the

After we ended [the conversation about the green shirt], I told [Hartzog] that Dye had asked me to check on the shaker screen and observe safety habits.

I waited about 30" and went down the hill to observe everyone. First thing I see is [Hartzog] at the shaker screen using torch to cut. No shield, no sleeves; took me off-guard. I had told him I was going to be there, so I was surprised he was not wearing PPE in light of that.

\* \* \*

Billy takes a piece of metal grinds some – same requirement (for PPE). He grinds it down–still no PPE. Then he takes the welding gloves off and picks up the metal bare handed – no cut level 4 [gloves].

\* \* \*

After that, he went up the hill to the shop, and I tried to talk to him. As nice as possible, I said "I know you're one of my bosses. Most of the time, I'm not in the position to ask anything. But how can we ask our guys to work safely and follow rules if the leaders don't? You didn't wear [a] shield while cutting and grinding, didn't wear sleeves, cut proof gloves when picking up metal and just now, you didn't have your vest on." He said, "I don't have to wear the vest when welding." I told him, "I understand, but you weren't welding when you were going up the hill just now." "Look, you need all this stuff, like your shield."

(Doc. 19-9 at 22). Morrow stated that Hartzog told Morrow that he could not see out of his shield because it was cracked, to which Morrow replied "[t]hen lets get one you can see out of. You need a vest, gloves, and welding jacket." (Doc. 19-9 at 22).

---

matter that Stewart and Dye were the decisionmakers for Hartzog's termination. (*See*, doc. 20 at 6-7, ¶¶82-84 (quoting Willet's notes that Stewart said: "Once we talked, Mike and I, we moved from suspension to term.")). Regardless, the Court cites to Morrow's statements as reflected in this document, and others, only for the purpose of establishing what Morrow "claims" happened, and for the purpose of establishing what he reported, not that these things actually happened.

Morrow stated that Hartzog told him that the welding jacket was "on the way." (Doc. 19-9 at 22). Morrow told Willet:

> Fine, but you can't weld without it. You can get one in a couple of hours, not days. We are supposed to have them on hand. He should have never been welding or grinding. We are told we would not be asked to do a job without proper PPE.

(Doc. 19-9 at 22).

Hartzog agrees that, while using an acetylene torch, he is required to wear a face shield, glasses, sleeves and cut resistant welding gloves in order to comply with the PPE policies. (Doc. 19-1 at 40(153-154)). In his deposition, Hartzog stated that he "had never used a face shield. [He] had used the torch a hundred times." (Doc. 19-1 at 19(70)). He also stated: "I really never seen anybody wear a face shield when they used a torch." (Doc. 19-1 at 32(123)). Hartzog agreed that if someone mentioned to him that he was violating a safety policy and needed to put on the proper PPE, he should follow that person's recommendation. (Doc. 19-1 at 18(67)).

In his deposition, the Plaintiff stated that he "can't remember" whether he was cutting with an acetylene torch that day. (Doc. 19-1 at 39(150-151)).[14] Hartzog stated

---

[14] In Hartzog's deposition the following exchanges took place:

Q.    Okay.  And did you cut with an acetylene torch that day?

A.    If -- I don't think so, because most of the things that we had to put on – I may have used a grinder a little bit.  But most of the things that we had was already cut, and the things that we didn't, David Webber cut them in

17

that, although he could not remember if he was using a torch when Morrow saw him, he "may have done a little." (Doc. 19-1 at 42(161)). The following exchange took place in his deposition:

Q.     Were you at the shaker screen?

A.     I was at the shaker screen.

Q.     Were you using a torch there?

A.     I was around Marcus when he was using it. I was -- we were

the shop. And I had to -- I went up there and got them and brought them back.

(Doc. 19-1 at 38(148)).

Q.     Were you cutting with a torch that day?

A.     I can't remember, but like I said, Marcus did the biggest majority there. I -- that morning when I come in, I put -- like I said, I wore that large to help Marcus try and get stuff welded out.

(Doc. 19-2 at 39(148-149)).

Q.     Do you recall using a torch?

A.     I don't recall using a torch. I --

Q.     One way or the other, whether you were or you were not?

A.     Like I said, most of what I did down there, I was marking -- measuring and marking, and Marcus was coming behind me and cutting.

Q.     So you're not sure if you used a torch or not that day or that time?

A.     I'm not sure.

(Doc. 19-1 at 40(153)).

standing beside one another, and I was marking what he was cutting.

\* \* \*

A.   At the screen, when I took the material that David cut down -- David Webber -- down there to where me and Marcus was putting them in, and it was pieces of some angle, the only thing that I can remember us using a torch down there on that day was where I was marking on that – I think we had some plate down there, and I was marking what we needed off the plate. And Marcus was coming behind me and cutting it.

Q.   Okay. But I'm just asking you, at the time that you were at that shaker screen, you didn't have a shield?

A.   I did not have a shield.

Q.   And you didn't have sleeves?

A.   I did not have sleeves. But I wasn't using -- the best of my knowledge, I wasn't using the torch. I was standing there beside Marcus.

(Doc. 19-1 at 39(152), 40(155-156)).

Although the parties cite to no portion of Hartzog's deposition where he states what Morrow told him, Hartzog's testimony makes it clear that Morrow said something to him about proper PPE. Hartzog admits that he showed Morrow the face shield he had and that it was broken. Further, Hartzog testified:

I went up to the shop, and David Webber was in the shop. And we was -- me and Justin was over there, and I told him -- he seen the face shield and all that I had, and he said he had some new ones. Well, he went in

the office in there and got the new face shields and put on -- he had them hid, so the construction people wouldn't take them. . . . And I put a new shield and all on, and I took it.

(Doc. 19-1 at 40(156)-41(157)). Finally, Hartzog testified:

And I took it to Morrow and showed him that I had a welding jacket. And I showed him that I had a good hood and everything to wear. . . . And I come back and thanked Morrow for trying to look out for me and make sure I had everything I need.

(Doc. 19-1 at 41(160)).

Hartzog does not remember, but admits that it is possible that he handled metal without cut resistant gloves. (Doc. 19-1 at 41(157)).[15]

### 3.   *October 11, 2013*

On October 11, 2013, Davis was acting as a safety "coordinator"[16] and reported he witnessed Hartzog "blowing a hole out" using an acetylene torch. In his deposition, Hartzog explained:

A.   I wasn't cutting.

Q.   What were you doing with the acetylene torch?

---

[15]   As noted by Hartzog, this admission also leaves open the possibility that he did not handle metal without cut resistant gloves.  (Doc. 20 at 5, ¶52).

[16]   It is also undisputed that Davis acted in this capacity the entire week of the shutdown. As noted previously, it is undisputed that, on October 9, 2013, Morrow was acting as a "safety advocate."  (Doc. 19-1 at 37(144)).  The parties have not been clear as to the difference between the two positions.  However, it appears that both positions required supervision of mill work to ensure compliance with safety protocols.

A.     I was blowing a hole out.

Q.     Okay. And blowing a hole out means turning it on?

A.     I turned it on and blew pressure through it about 10 or 15 seconds.

(Doc. 19-1 at 42(164)). It is undisputed that, for the job Hartzog was doing, the proper PPE included a face shield, jacket, glasses, and gloves. Hartzog failed to wear the proper PPE while using the acetylene torch and stated in his deposition that he has "never denied that." (Doc. 19-1 at 43(168)). Davis tried to give Hartzog his gloves and glasses but Hartzog "blocked [Davis] out." (Doc. 19-1 at 44(171)).

### 4.     *The Scissor Lift Incident*

During the plant shut down week, Davis would periodically correct safety issues and almost everyone listened to his requests. However, Davis mentioned one incident regarding Stewart in the following exchange in his deposition:

A     . . . .They were putting a top on the gas tanks where the gas is held at.

Q     All right.

A     And when the guys were on the roof, they had to leave the [scissor] lift to get on the roof.

Q     Uh-huh.

A     But they weren't harnessed on.

21

Q      Okay.

A      And I told them that they needed to harness up. And --

Q      Who did you tell?

A      David Stewart.

* * *

Q      All right. So what did you say?

A      I told him that they were suppose to be harnessed up four foot off the ground.

Q      Okay.

A      And with their lanyards tied off.

Q      Okay. And what did he say?

A      There's nowhere to tie on.

Q      Okay. Was there anywhere to tie off?

A      No.

* * *

A      So I go back over [later] and I say something again.

Q      Okay.

A      And I was told it's being taken care of.

Q      Okay. And who told you that?

A       David [Stewart].

* * *

Q       . . . Okay. Do you -- what were they doing on the roof?

A       Putting it on.

Q       Okay. It was my understanding --

A       Metal roofing.

Q       Huh?

A       Metal roofing.

Q       Okay. Were they just putting a ridge cap on it, or were they just putting a --

A       Ridge cap, yeah, that sounds -- yeah.

Q       Just that ridge cap?

A       Correct.

(Doc. 19 at 17(62-64). The discussion continued:

A       If you tie off to a scissor lift, you have to harness to the scissor lift. Your lanyard goes to the scissor lift.

Q       Uh-huh.

A       If you leave the lift, you have to have one on, one off, until you leave. And once you leave the equipment, you take the next one off.

Q       Okay. You're supposed to have one on where?

23

A       On the lift and then whatever you're going to.

Q       So when you're on the lift, you have to tie off to the scissor lift?

A       Correct.

Q       Okay. And then when you get off the scissor lift, do you tie -- do you unhook from your scissor lift?

A       After you've tied off to what you're going to and have left the lift.

Q       Okay. And was there a way to tie off to what they were going to on the roof?

A       No.

Q       Okay. Do you know if it's allowed to just remain tied off on a scissor lift when you're off of the scissor lift?

A       No, you can't.

Q       You can't do that?

A       No.

Q       Okay. So then --

A       If the scissor lift falls, you go with it.

Q       Right. Right. Okay. And there was no other place for them to tie off?

A       No.

(Doc. 19-6 at 18(66-67)).

The parties have cited no evidence that Hartzog was involved in any way with

the scissor lift incident.

### H.   Reports of Hartzog's Conduct and Hartzog's Termination

On October 11, 2013, Davis spoke with Stewart and informed him as to what

happened with Hartzog. (Doc. 19-6 at 20(73)). According to Stewart's affidavit:

> Davis reported to [Stewart] that . . . Hartzog was not wearing the
> appropriate PPE while using a torch and even though he pointed out to
> Hartzog he was not wearing the appropriate PPE, Hartzog ignored him.
> Davis advised that Hartzog performed cutting work without a face
> shield, safety glasses or a welding jacket . . .. I notified Dye . . . and we
> met both met with Hartzog.

(Doc. 19-2 at 21, ¶13). Hartzog has never denied that he was not wearing the proper

PPE and was suspended until further investigation. At that point, Dye and Stewart

intended to suspend Hartzog for a week and require Hartzog to go through retraining

as if he were a new employee.

The following Monday (October 14, 2013), Dye and Stewart interviewed Davis

regarding his claim that Hartzog failed to wear PPE after being placed on notice of

a deficiency. (Doc. 19-2 at 22, ¶14). Davis reported that he observed Hartzog cutting

with an acetylene torch with no face shield, safety glasses, or sleeves/welding jacket.

(Doc. 19-2 at 23, ¶14). Davis reported that he told Hartzog he needed to wear the

proper PPE and Hartzog told him that his PPE was in the breakroom. (Doc. 19-2 at

23, ¶14). Davis reported that he tugged on Hartzog's pants leg to try to hand him

glasses, but Hartzog refused. (Doc. 19-2 at 23, ¶14).

Dye and Stewart next interviewed Morrow. In his affidavit, Stewart states:

Morrow advised that he witnessed Hartzog cutting with an acetylene torch without wearing a face shield or sleeves/welding jacket and was only wearing welding gloves and safety glasses. Morrow advised that while he was watching him, Hartzog removed the welding gloves and handled metal without cut resistant gloves. Morrow advised that he told Hartzog he needed the proper PPE and offered to get it for him, but Hartzog turned him down. However, Hartzog later went to the shop and was able to obtain a face shield and a welding jacket that day.

(Doc. 19-2 at 22-23, ¶14). It is undisputed that, based on the interviews with Davis and Morrow, there were a total of three (3) back to back incidents during a two (2) day period involving Hartzog, with one of the incidents occurring after Hartzog had previously obtained (but was not using) the proper PPE. Based on these interviews, Dye and Stewart decided that termination, rather than suspension, was warranted.[17] At that time, Dye was aware that a variation of the term "nigger" had been used in reference to Machen by someone, but did not know who had said it. Dye did not know about Horton's use of the "50/50" phrase towards Machen.

Step 4 of the Resolute's Corrective Action program requires that "decision[s] to discharge any employee must be reviewed by the Department Superintendent, Human Resources, and Safety Manager." (Doc. 19-2 at 14; doc. 19-8 at 23). On

---

[17] Hartzog cites to Willet's notes of his interview with Stewart.  He notes that Stewart said, "Once we talked, Mike and I, we moved from suspension to term."  (Doc. 19-9 at 25).

October 21, 2013, Dye sent an email to Donahue and Kent Cumberton, the General

Manager of the US Wood Products division of Resolute, with a copy to Stewart,

which stated:

> David Stewart and I interviewed two employees concerning two
> separate incidents at the [mill]. Justin Morrow worked as a Safety
> Advocate on Wednesday, October 9. Jamie Davis operated a loader on
> Friday, October 11. []
>
> Justin Morrow – October 9
> -   At approximately 9:00 a.m. Justin observed cutting and grinding
>     work in the overs conveyor area.
> -   Billy Hartzog was cutting with an acetylene torch.
> -   Hartzog did not wear a face shield or sleeves.
> -   Morrow told Hartzog that he needed to wear proper PPE.
> -   Hartzog went to the shop and obtained a face shield.
> -   Another employee, David Webber, obtained sleeves for Hartzog.
> -   Hartzog only wore welding gloves and safety glasses.
> -   Hartzog removed the welding gloves and handled metal without
>     cut resistant gloves.
>
> Jamie Davis – October 11
> -   At approximately 12:15 p.m., Jamie was walking to begin operating a
>     front-end loader.
> -   Going to the loader, Jamie observed Billy Hartzog cutting with an
>     acetylene torch on the chipper discharge conveyor.
> -   Hartzog did not wear a face shield, safety glasses or sleeves.
> -   Jamie told Hartzog that he needed to wear proper PPE.
> -   Hartzog told Jamie that his PPE was in the breakroom.
> -   Jamie tugged on his pants leg to try to hand Hartzog safety
>     glasses.
> -   Hartzog refused.
>
> The findings from these two interviews warrant no further investigation.
> We recommend immediate discharge of Billy Hartzog from employment

at [the mill].

***

Please consider and advise.

(Doc. 19-8 at 48) (underlining in original).

In response, Donahue wrote an email to Dye stating:

Mike, what has been your history of discipline for similar offenses? Please also send me any posted rules on PPE requirements, consequences for violation, etc. Does Jamie Davis report to Hartzog? Is there any history of conflict between the two?

(Doc.19-8 at 51). In reply to Donahue's email, Dye wrote:

This is the first blatant incident of a PPE violation of Hot Work, Lockout or Fall Protection. Blatant refers to ignoring correction from a co-worker. Attached are the Hot Work Policy, PPE Policy and discipline excerpt from the Employee Handbook. Jamie Davis reports to Josh Horton not Billy Hartzog. Hartzog has had some conflict with most employees.

Hartzog received training in all safety policies. The training is documented.

(Doc. 19-8 at 51). In his affidavit, Donahue stated:

Based on the reporting by two (2) employees of two (2) separate occasions in a two (2) day period that they caught Hartzog utilizing an acetylene torch without donning the required PPE, and that even after being reminded of the PPE requirements and still failing to comply, which was particularly troublesome given Hartzog's position as a Team Leader, Hartzog's employment with Resolute was terminated.

(Doc. 19-4 at 4, ¶5). Donahue was unaware of incidents with Davis and Horton using

28

racially derogatory terms towards Machen.

In the termination letter sent to Hartzog, Dye stated that

the Company regards your failure to comply with these safety rules as serious misconduct in violation of the employee Code of Conduct:

> *"Violations for which an employee may be suspended or discharged without recourse to any of the "steps" include, but are not limited to:*
> *Deliberately disregarding safety rules, practices, and the Lock-Out procedures."*

(Doc. 19-9 at 1) (italics in original).

## I.   **The Conflict Resolution Procedure**

Hartzog initiated Resolute's Conflict Resolution Procedure by sending an email to Resolute's Human Resources Manager to review his termination. In Hartzog's email, Hartzog stated that he had apologized to Stewart for "letting him down" as Stewart entrusted him to perform the job safely and stating "[i]f I am allowed to keep my job, this incident will not happen again or any of the people around me." (Doc. 19-9 at 8; doc. 19-1 at 47(181-182)).

As noted previously, Resolute assigned Willet to conduct an investigation of the reported incidents involving Hartzog and his termination. Willet interviewed Hartzog and seven (7) Resolute employees.  The interviews with other employees indicated to Willet that Hartzog refused to wear the appropriate PPE after warnings

from Horton and Davis.   At the time of the interviews, Willet was not made aware of any use of the "50/50" language or the reporting of that language by anyone to another Resolute employee. Willet questioned Hartzog and Davis regarding the racial slur incident between Davis and Machen, but was not made aware of Hartzog reporting it. Willet's interviews disclosed the incident related to Hartzog handling metal without cut resistant gloves, the two (2) back to back instances where Hartzog used a torch without the proper PPE, even though he obtained the proper PPE after the first time he was reminded, and another incident that occurred on October 9, 2013 where Morrow confronted Hartzog regarding his failure to wear a high visibility shirt and offered one to him, but Hartzog refused. Based on the interviews conducted by Willett, Resolute determined the termination was appropriate.

### J.   Other Facts

Hartzog filed a claim with the Alabama Department of Labor ("ADOL") and participated in a hearing while under oath. Hartzog failed to allege any retaliation in his written statement regarding his termination or during sworn testimony at a hearing on his claim. The Decision on Unemployment Compensation Claim found that the preponderance of evidence showed that Hartzog was discharged for violation of Resolute's safety policy. Hartzog did not appeal the decision.

Hartzog filed a Charge of Discrimination with the EEOC on the 27th day of

December, 2013. Prior to filing his EEOC charge, Hartzog never made a complaint

to anyone at Resolute that he felt like he was being retaliated against.

## III.   ANALYSIS

### A.   <u>The Plaintiff's Claim and the Applicable Standard</u>

In Count One, the only count of the complaint, Hartzog alleges, in pertinent

part:

> 28.   Defendant retaliated against Plaintiff for engaging in statutorily
> protected activity when he reported conduct in the workplace that
> violated the federally protected rights of employees under his
> supervision that were being subjected to racially offensive terms.
> Plaintiff's role in reporting those racial terms to management resulted in
> Plaintiff being terminated within a month of such report despite
> Plaintiff's long work record with Defendant.
>
> 29.   In terminating Plaintiff's employment in retaliation for Plaintiff
> engaging in statutory [sic] protected activity when he reported conduct
> in the workplace that violated the federally protected rights of others,
> Defendant violated Title VII, causing damage to Plaintiff in terms of lost
> pay, benefits[,] and mental anguish.

(Doc. 1 at 5, ¶¶28-29).

The Eleventh Circuit has noted:

> Title VII prohibits an employer from discriminating against an
> employee because the employee "opposed any practice" made unlawful
> by Title VII (the "opposition clause"), or "made a charge, testified,
> assisted, or participated in" a Title VII proceeding or investigation (the
> "participation clause"). 42 U.S.C. § 2000e–3(a). Absent direct evidence
> of discrimination, when analyzing claims for retaliation, we employ the
> analytical framework set forth in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir.2009). Under this framework, the plaintiff must first establish a prima facie case of retaliation. *Id*. Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action. *Id*. at 1308. The plaintiff then has an opportunity to demonstrate that the defendant's proffered reason was pretext for discrimination. *Id*.

In order to establish a prima facie case of retaliation, a plaintiff may show that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) she established a causal link between the protected activity and the adverse action. *Id*. at 1307–08. Where a plaintiff is engaged in protected conduct pursuant to the "opposition clause," a plaintiff need not prove that the underlying discriminatory conduct that she opposed was actually unlawful, but rather must show that she had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir.1997). A plaintiff must not only show that she subjectively, in good faith, believed that her employer was engaged in unlawful employment practices, but also that her belief was objectively reasonable in light of the facts and record. *Id*. We have previously said that a plaintiff did not satisfy the objective reasonableness inquiry where the plaintiff failed to cite any statutory or case law that could reasonably be believed to support the plaintiff's claim. *Dixon v. Hallmark Cos.*, 627 F.3d 849, 857 (11th Cir.2010). Unfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII. *Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1074 (11th Cir.1995).

To establish pretext, the plaintiff may demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1538 (11th Cir.1997) (quotation omitted). "But a reason cannot be

proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (emphases omitted). Accordingly, it is not enough to "disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Id*. at 519, 113 S.Ct. 2742 (emphases omitted).

*Knott v. DeKalb Cty. Sch. Sys.*, 624 F. App'x 996, 997–98 (11th Cir. 2015).

In the Complaint, the bases for the Plaintiff's claim are: 1) the Plaintiff's one time reporting, to Stewart, of Davis's use of a variation of the word "nigger," regarding Machen, during a safety meeting; and 2) the Plaintiff's one time reporting, to Stewart, of Horton's previous custom of using the phrase "50/50" when referring to Machen. (Doc. 1 at 3, ¶¶11-15). Neither of these incidents constitute the Plaintiff making a charge, testifying, assisting, or participating in a Title VII proceeding or investigation. Therefore, the Plaintiff is not making a "participation clause" claim. *See*, *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) ("[The Participation clause] protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC."). Instead, the Plaintiff admits that his claim is an "opposition clause" claim–a claim where the Plaintiff was retaliated against because he opposed a practice made unlawful by Title VII. (Doc. 20 at 17).

In his brief in opposition to the Motion for Summary Judgment, the Plaintiff makes no argument regarding the "50/50" claim. Accordingly, that basis for his claim is deemed to be abandoned. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").[18]

## B.   The Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation

The Defendant argues that the Plaintiff "cannot establish [that] he engaged in a statutorily-protected activity[.]" (Doc. 18-1 at 19). The Court agrees.

First, there is no evidence that either of the reports at issue were "in opposition" to anything. The Plaintiff was merely reporting, to his supervisor, conduct of others. Certainly the conduct which he reported was inappropriate. However, that does not mean that the Plaintiff, in reporting it, was "opposing" it. *See*, *Sawicki v. Am. Plastic Toys, Inc.*, 180 F. Supp. 2d 910, 918 (E.D. Mich. 2001) (a plaintiff cannot rely on the mere delivery of subordinates' complaint to management to establish plaintiff's own opposition to the misconduct).[19]

---

[18] In its brief in reply to the Motion for Summary Judgment, the Defendant implies that there may be another basis for Count One not set out above. The Court sees no other basis asserted in the Complaint. Regardless, because the only basis argued in response to the motion is the Plaintiff's reporting of Davis's comment in the safety meeting, all other bases are deemed abandoned.

[19] *Sawicki* dealt with an actual <u>complaint</u>. In the instant case, it is difficult to say that the Plaintiff was reporting a "complaint" of misconduct by anyone. The Plaintiff cites to an

_____

example in the EEOC Compliance manual which he argues is "analogous to [the] Plaintiff's statutorily protected activity." (Doc. 20 at 15-16).  However, he does not explain how his conduct was a "complaint."

The Plaintiff also argues that Harry and Peters, having "complain[ed] to co-workers about harassment" "engaged in statutorily protected activity." (Doc. 20 at 16).  As shown below, whether these individuals were so engaged does not mean that the <u>Plaintiff</u> was.  Further, it is arguable whether Harry and Peters, who merely <u>reported</u> Davis's comment to the Plaintiff, could be considered to have "complained."  Davis's comment was not directed towards either of them.  Still, there is evidence that Peters said; "I can't believe [Davis] said that in there." (Doc. 19-1 at 34(131)).  Harry also said that he "didn't understand how [Davis] could do that." (Doc. 19-1 at 34(131)).  The court will give the Plaintiff the benefit of the doubt and construe these comments to be "complaints."  Further, in its Answer, the Defendant <u>did</u> admit "that Plaintiff had a discussion with Stewart concerning a <u>complaint</u> and that Plaintiff acknowledged that Plaintiff would address the complaint with Mr. Davis." (Doc. 9 at 3, ¶13) (emphasis added).  The Plaintiff cites no evidence, and makes no argument, that Davis's statement regarding Horton's "50/50" comment was a "complaint."

Assuming these individuals were "complaining" of illegal discrimination, and were themselves engaged in statutorily protected activity, there is no evidence that the <u>Plaintiff</u> was acting on their behalf–only that he was reporting the conduct about which they complained up the chain of command.  Dealing with such a scenario, the court in *Sawicki* wrote:

> The plaintiff concludes her argument that she has satisfied the first prong of a prima facie case for a Title VII violation by asserting that her "filing of a complaint of sexual harassment on behalf of the women working on her shift with the plant manager was [therefore] a protected activity." Plaintiff's Brief at 10. However, the plaintiff has failed to demonstrate that she in fact acted "on behalf of" her subordinates, and thus how she "opposed" a violation of Title VII. Such opposition could have taken the form of a verbal complaint *by the plaintiff* to management claiming that Taylor engaged in the sexual harassment of her subordinates; she might have signed the complaint before she delivered it to Hebert and the human resources department manager; she might have asserted that she contacted an attorney on behalf of her subordinates to explore the viability of a lawsuit or filing a claim with the EEOC. There is no evidence that plaintiff engaged in any such conduct. <u>Instead, the plaintiff relies solely on the mere delivery of her subordinates' complaint to management to establish her own opposition to the misconduct, and then argues that her "opposition" was protected activity</u>.

*Sawicki*, 180 F. Supp. 2d at 917–18 (italics in original, underlining added).

The Plaintiff cites, without discussion, *Crawford v. Metropolitan Government of Nashville & Davidson County, Tenn.*, 555 U.S. 271, 274, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009), stating that "the United States Supreme Court held that the anti-retaliation statute's protection extended to an employee that speaks out about discrimination not on her own initiative, but in answering questions during an employer's investigation." (Doc. 20 at 17). The Plaintiff then argues, without authority:

> Likewise, the anti-retaliation statute is also appropriate to protect an employee that reports discrimination as part of his job duties require complying with the employer's policy to prohibit discrimination in the workplace.

(Doc. 20 at 17).

The Plaintiff's extension of *Crawford* was rejected by the Eleventh Circuit in *Brush v. Sears Holdings Corp.*, 466 F. App'x 781, 786–87 (11th Cir. 2012). In that case, the court wrote:

> [The plaintiff] argues that an investigative manager's role in reporting a Title VII violation necessarily qualifies as a "protected activity" relating to a discriminatory practice. Reply Br. at 5 ("[W]hen an employee communicates a belief that her employer has engaged in employment discrimination, that communication virtually always constitutes protected activity."). In support, [the plaintiff] cites

*Crawford*. In *Crawford*, the Supreme Court held that an employee that responded to an inquiry about whether she had ever witnessed "inappropriate behavior" from a specific employee was protected by Title VII. *Crawford*, 555 U.S. at 280, 129 S.Ct. 846. In so finding, the Court rejected the Sixth Circuit's reasoning that the opposition clause of Title VII "demands active, consistent 'opposing' activities to warrant ... protection against retaliation." *Id.* at 275, 129 S.Ct. 846 (*citing Crawford v. Metropolitan Government of Nashville & Davidson County, Tenn.*, 211 Fed.Appx. 373, 373 (6th Cir.2006)). Instead, the Court stated that the *Crawford* plaintiff's opposition was no less actionable because she had been asked about sexual harassment rather than having volunteered similar allegations. *Crawford*, 555 U.S. at 277–78, 129 S.Ct. 846.

[The plaintiff] would have us extend *Crawford's* reasoning not just to those directly impacted by workplace discrimination but to all individuals involved in the investigation of that discrimination, no matter how far distant. Although we have not yet passed on the transitive property of a Title VII claim, other circuits have by creating what is known as the "manager rule." In essence, the "manager rule" holds that a management employee that, in the course of her normal job performance, disagrees with or opposes the actions of an employer does not engage in "protected activity." *See McKenzie v. Renberg's Inc.*, 94 F.3d 1478 (10th Cir.1996); *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617 (5th Cir.2008) (same). Instead, to qualify as "protected activity" an employee must cross the line from being an employee "performing her job ... to an employee lodging a personal complaint." *McKenzie*, 94 F.3d at 1486. While [the plaintiff] argues that *Crawford* has foreclosed the "manager rule," we cannot agree. *Crawford* pertained only to whether the reporting of a harassment claim was covered by Title VII where the reporting was solicited rather than volunteered. *Crawford*, 555 U.S. at 277–78, 129 S.Ct. 846. It did not address whether a disinterested party to a harassment claim could use that harassment claim as its own basis for a Title VII action. Accordingly, we find the "manager rule" persuasive and a viable prohibition against certain individuals recovering under Title VII.

> Considering the facts adduced by the parties in light of the "manager rule," there can be no dispute that [the plaintiff] acted solely as a manager here. In her capacity as an investigator of [the] sexual harassment claim, [the plaintiff] informed Sears of [the] allegations, investigated those allegations, and reported the results of her investigation to Sears. [The plaintiff's] job responsibilities involved exactly the type of actions that [the plaintiff] took on [the complainant's] behalf. There is simply no evidence in the record that [the plaintiff] was asserting any rights under Title VII or that she took any action adverse to the company during the investigation.

*Brush v. Sears Holdings Corp.*, 466 F. App'x 781, 786–87 (11th Cir. 2012).

The Court finds the reasoning of *Brush* to be persuasive[20] and adopts it. Like the plaintiff in *Brush*, in the instant case Hartzog acted solely as a Team Leader when he investigated, reported, and corrected the conduct, and then reported the results to the company. There is no evidence in the record that the Plaintiff was asserting any rights under Title VII or that he took any action adverse to the company during the investigation.

Even if the Plaintiff was "opposing" the misconduct, as the Eleventh Circuit has noted

> "[b]y the terms of the statute ... not every act by an employee in opposition to racial discrimination is protected. The opposition must be directed at an unlawful employment practice <u>of an employer</u>, not an act of discrimination by a private individual."

---

[20] Eleventh Circuit Rule 36-2 provides that "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."

*Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997) (emphasis added) (*quoting Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978)); *see also*, *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008) (same) (quoting *Little* and *Silver*). Again, the Plaintiff's report to Stewart was of offensive comments by <u>other employees</u> at the mill. There is no evidence that Resolute condoned such language or that the comments should somehow be attributable to Resolute.

As noted above, not only must the Plaintiff be complaining of, or opposing conduct by his employer, he must also show both:1) that he subjectively, in good faith, believed that Resolute was engaged in unlawful employment practices; and 2) that his belief was objectively reasonable in light of the facts and record. The Plaintiff has not argued either. Instead, he states:

> Defendant's handbook contains a section titled "Harassment Prevention Policy and Procedure" which states as "Unacceptable Conduct" that "Verbal abuse and sexual, ethnic, or racial slurs will not be tolerated." The policy also states that "All members of management have a duty to immediately address any incidents they may witness and to report such incidents to the Human Resources Department at the appropriate location." And, importantly, "There will be no retaliation against any other individual who participates in good faith in the investigation of a complaint." (Doc. 19-8, p. 16-17). In light of Defendant's handbook, <u>Plaintiff's belief that he engaged in statutorily protected activity is objectively reasonable</u>. In light of employee complaint's about the use of a single racial slur by an employee that was beneath Plaintiff in Defendant's chain of command, <u>Plaintiff's belief that he engaged in</u>

statutorily protected activity is subjectively reasonable. Defendant's own
Handbook contradicts Defendant's argument that Plaintiff did not
engage in statutorily protected activity. Pursuant to Defendant's own
policy, after Plaintiff, a Team Leader, received a complaint about a
racially hostile word uttered to an employee by an employee, Plaintiff,
as any good supervisor would do, informed his own supervisor.

(Doc. 20 at 16) (emphasis added). This argument misses the point. The issue is not

whether the Plaintiff subjectively or objectively had a reasonable belief that he was

engaging in statutorily protected activity. Rather, the issues are whether the Plaintiff

subjectively believed that Resolute was engaged in unlawful employment practices,

and whether that belief was objectively reasonable.

The Plaintiff also argues:

Defendant does not dispute, that Plaintiff "did report to his supervisor,
David Stewart, that a racial slur was made by one employee to another."
(Pl. Ex. 4: Def. Bates Stamp 155). Stewart then took action by calling "a
meeting of the Team Leaders, including Mr. Hartzog, and instructed
them that the use of inappropriate language and comments was not to be
tolerated by any employee." (Pl Ex. 4: Def. Bates Stamp 155-56). In
light of Stewart's response to Plaintiff's report of a single "racial slur
[that] will not be tolerated," a reasonable jury can conclude Plaintiff
clearly engaged in statutorily protected activity that was both
subjectively and objectively reasonable under the circumstances.

(Doc. 20 at 18-19) (emphasis added). Here, the Plaintiff mistakenly focuses on

whether the opposition itself (mentioning the comments to Stewart) was subjectively

and objectively reasonable. Again, that is not the test.

At the end of the day, the Plaintiff has not even identified an alleged unlawful

practice of the Defendant, much less argued that his reports were in opposition to such a practice. However, assuming that the Plaintiff is alleging that Davis's conduct created a hostile working environment, for which the Defendant should be liable, and that in reporting that conduct the Plaintiff subjectively believed that he was opposing the Defendant's creation of a hostile work environment, the Plaintiff's claim still fails.

"Where binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of this Court or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable." *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008). The Eleventh Circuit has held that "sporadic and isolated" incidents of racially derogatory terms does not constitute create a hostile working environment. *McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008). In this case, the Plaintiff admitted in his deposition that he had never heard Davis use the variation of the word "nigger" at work before in reference to Machen, and there is no evidence that it was used any other time by anyone else. This single isolated incident cannot be the basis for a "hostile work environment." *McCann* is binding precedent, and no decision of the Eleventh Circuit or of the Supreme Court has called that precedent into question or

undermined its reasoning. Accordingly, even if the Plaintiff had alleged that he was opposing a hostile work environment created by these isolated comments (and he did not), his belief that the practice is unlawful is objectively unreasonable.[21]

Further, based on the facts of this case, such belief would not be objectively reasonable. Stewart, upon first hearing that a racial slur had been used, expressly informed the Plaintiff that the Plaintiff "needed to get up there and talk to [Davis] and tell him it will not be tolerated." (Doc. 19-1 at 35(133)). Also, after learning about Horton's "50/50" comment, Stewart made it clear to the Plaintiff and Horton that such language would not be tolerated, and that both of them needed to make sure all of the employees under them were aware of the policy. Stewart even asked the Plaintiff to ask Machen if Machen wanted to file a complaint. (Doc. 19-2 at 20, ¶12). There is no evidence of any further racially derogatory remarks. Stewart never received any other complaint of inappropriate language. The Plaintiff never again heard of, and Machen never complained about, the use of the word "nigger" or the term "50/50." Machen told the Plaintiff that such language had stopped. Nothing about these facts suggests that the Defendant allowed such conduct or should be held responsible for it. *See*, *Little*, 103 F.3d at 959 ("We previously have held that in order to hold an employer

---

[21]   The Plaintiff, argues in footnote 2 of his brief, without authority, that this reasoning is "counterintuitive to the purpose of Title VII."  (Doc. 20 at 18). The Court finds no merit in this unsupported and underdeveloped argument.

responsible under Title VII for a hostile environment created by a supervisor or co-worker, a plaintiff must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action.").

## IV.   CONCLUSION

Based on the foregoing, the Plaintiff has failed to make out a prima facie case of retaliation based on the opposition clause of Title VII. Summary judgment is therefore appropriate for the Defendant.[22] A final order will be entered.

**DONE** this 27th day of October, 2016.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[22] Since the Court has determined that the Plaintiff cannot make out a *prima facie* case of retaliation because he did not engage in statutorily protected activity, it will not address the Defendant's argument that the Plaintiff cannot make out a *prima facie* case of retaliation because he cannot establish causation. (*See*, doc. 18-1 at 23-25; doc. 24 at 8-9). Further, the Court will not address the Defendant's argument that the Plaintiff cannot establish pretext. (*See*, doc. 18-1 at 25-32; doc. 24 at 9-10).

43